## Case No. 5,750.

### GREELY et al. v. SMITH.

[3 Woodb. & M. 236.] 1

Circuit Court, D. Maine. Oct. Term, 1847.

PRIOR JUDGMENT—BAR—BOTTOMRY BOND—WHEN VALID.

1. A prior judgment between parties not nominally the same, must be avowed and proved to be between privies in interest, or it is no bar.

2. So a prior judgment of nonsuit between the same parties on the same subject must be alleged to have been on the merits in order to prevent another recovery.

1 [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

3. A bottomry bond is not valid as such unless the debt is risked on the loss of the vessel. Marine interest secured is one evidence of this risk, but is not alone sufficient to show the bond to be in bottomry.

4. If the person be still liable in the event the vessel is not lost, the obligation may be good in bottomry, but not so if the person is liable though the vessel is lost.

5. The last provision is fatal to the bond as in bottomry, unless it is included in the bond as additional security, and in that event may, perhaps, be waived, and the bond otherwise be good.

6. A bottomry bond should not be valid for a pre-existing debt, but only for advances to aid in repairs or outfits and cargo for the voyage.

[Cited in The Native, Case No. 10,054.]

7. When otherwise good, it is usually by special statute, or is good merely as a mortgage, where a mortgage, under like circumstances, is valid. It is not good as a mortgage if the vessel be left in possession of the former owner, and the state laws require it to be recorded to be good against a creditor, and it is not recorded when a creditor attaches a vessel.

[Cited in Stillman v. White Rock Manuf'g Co., Case No. 13,446.]

This case was drawn up by counsel, in the words following:

This is an action of trover for an alleged taking and converting, by the defendant [Joseph Smith], of the brig Albert and of two-third part of the brig Watson, on the 7th day of January, 1842; said vessel being alleged to be the property of the plaintiffs [Philip Greely, Jr., and others]. The writ is dated January 10th, 1842, and may be referred to by either party. Plea,—the general issue and joinder. It is admitted that Smith, the defendant, was at the time of the alleged taking, sheriff of the county of Cumberland. The plaintiffs read in evidence, the following papers, dated May 11, 1838, and October 26, 1839, viz:

"To all whom these presents shall come. I, Luther Jewett, of Portland, county of Cumberland, state of Maine, owner of the brig called the Albert, of Portland, of the burthen of about 214 tons, now lying in this port of Portland, and bound on a voyage hence to the port of Guyama, Porto Rico, and thence back to Portland or Boston, or a port of discharge in the United States, sendeth greeting. Whereas, I, the said Luther Jewett am under the necessity of borrowing the sum of $2,200 for the purchasing and fitting out of the said brig, for the said intended voyage; and Messrs. Greely and Guild, merchants of Boston, have lent and advanced to me, the said Luther Jewett, the said sum of $2,200, viz., $1000 in cash, and two acceptances of theirs of this date, each for $600, payable in sixty days and grace, at the rate of two and one-half per cent. on said sum, for the purpose of purchasing and fitting out the said brig, as aforesaid. Now, know ye, that I the said Jewett, do, by these presents, for myself, my executors and administrators, covenant, grant and agree, to and with the said Greely and Guild, that the said brig called the Albert shall, with the

first fair wind set sail and depart from this port of Portland, after being loaded, and proceed directly to the port of Guayama, and from thence return back to a port of discharge in the United States, and here end her intended voyage. And I, the said Luther Jewett, for and in consideration of the said money and acceptance to me in hand paid by the said Greely and Guild, at and before the ensealing and delivery of these presents, the receipts whereof is hereby acknowledged, do bind and obligate myself, my heirs, executors and administrators, my goods and chattels, and particularly the said brig Albert with her hull or body, together with her tackle and apparel and freight, to be earned for the said voyage, to pay the said Greely and Guild, their executors, administrators or assigns, the said sum of $2,200; provided the acceptance of said Greely and Guild paid by them as so much of the $2,200 as may be paid by them within sixty days next after the safe arrival of the said brig Albert at her port of discharge in the United States, from the said intended voyage; together with six per cent. interest thereon, amounting together to the sum of $2,320. And I, the said Luther Jewett, for myself, my heirs, executors and administrators, covenant, grant and agree, to and with the said Greely and Guild, their executors administrators, by these presents, that I am the true and lawful owner of the said brig, and that I have good authority to charge and engage said brig as aforesaid; and that the said brig shall at all times after the said voyage, be liable and chargeable for the said sum of $2,320, with the interest thereon as aforesaid, until paid. In witness thereof, I have hereunto set my hand and seal this 11th day of May, in the year of our Lord, 1838. Luther Jewett. (L. S.)

"Signed, sealed, and delivered, in presence of George Jewett.

"Cumberland, ss. Then personally appeared the above named Luther Jewett, and acknowledged the above instrument to be his free act and deed, this 11th day of May, A. D. 1838. Before me, R. W. Lincoln, Jus. Pacis."

"Know all men by these presents, that, I Luther Jewett, of Portland, county of Cumberland, state of Maine, am held and firmly bound unto Messrs. Greely & Guild, of Boston, commonwealth of Massachusetts, in the just sum of $3,600, money of the United States of America; for the payment of which sum well and truly to be made, I hereby bind myself and respected heirs, executors and administrators, by these presents. Dated at Portland, aforesaid, this 26th day of October, in the year of our Lord one thousand eight hundred and thirty-nine. Whereas the said Greely and Guild have this day lent and advanced unto the said LutherJewett, the sum of $3,600, at bottomry, on the body, tackle and furniture, of the brig Albert, of Portland, whereof ——— Beanderly

is at present master, and said Luther Jewett being sole owner of said brig Albert. Now the condition of this obligation is such, that if the said Luther Jewett, his heirs, executors or administrators, shall and do within one year from the date of this instrument, well and truly, or cause to be paid unto the said Greely and Guild, their successors or assigns, the above sum of $3,600, the amount loaned, together with marine premium and interest thereon at the rate of six per cent. per annum; if during any voyage of said brig Albert, an utter loss of said vessel by fire, enemies, men-of-war, or any casualty shall unavoidably happen and to said Luther Jewett, his heirs, executors or administrators, shall, and do well and truly account for upon oath if regained, and pay unto said Greely and Guild, their successors or assigns, the whole salvage on said brig Albert, the vessel and appurtenance, then their obligation to be void; otherwise to be and remain in full force and virtue; and in consideration of, and as security for said bond, premium and interest, the said Luther Jewett does by these presents assign, pledge, mortgage, set over, transfer and convey said brig Albert, the vessel and appurtenances to the said Greely and Guild. It being mutually understood and agreed, that in case the amount of said loan, premium and interest, or any part thereof, according to the terms of these presents, shall remain due and unpaid to said Greely and Guild, after the expiration of one year from the date of these presents, the said Greely and Guild may take possession of said brig Albert, the vessel and appurtenances, and sell the same at public auction in order to satisfy what may then remain due, without any proceedings in court, or otherwise, for the purpose of authorizing such sale, and therefore may execute and deliver a sufficient bill of sale to transfer completely to any purchaser or purchasers, all title and property in and to the said brig Albert, the vessel and appurtenances, to the said purchaser or purchasers, as owner or owners thereof now belonging. The said Greely and Guild thereupon to account to the said Luther Jewett for any surplus of proceeds of such sale after paying all charges and expenses and all demands which said Greely and Guild may then have against said brig Albert. The said Greely and Guild discounting interest for anticipating the payment of the demand not then presently due; and in case of such sale aforesaid, the said Luther Jewett, his heirs, executors, administrators or assigns, shall, whenever they are requested, make, execute and deliver to said purchaser or purchasers another bill of sale of said brig, the vessel and appurtenances, in which the register shall be recited, or any further documents that may be necessary for transferring completely to said purchaser or purchasers, all the right, interest and claim of said Luther Jewett, his heirs, executors, administrators or assigns, as owners of said brig

Albert the vessel and appurtenances. Luther Jewett. (L. S.)

"Signed, sealed, and delivered in presence of George Jewett, James C. Jewett."

Also, a bond of the same tenor and date, (Oct. 26, 1839,) executed by Luther Jewett to Greely and Guild, of two-thirds of the brig Watson, for $2,000.

George Jewett, a witness called by plaintiffs, testified that he witnessed the bond of May 11, 1838, and the two bonds of October 26, 1839. Luther Jewett, a witness called by plaintiffs, testified that he owned the Albert and two-thirds of the Watson, on May 11, 1838; that he sent the bond of May 11, 1838, to the plaintiffs, by mail, and has a letter of the plaintiffs' dated May 12, acknowledging its receipt. The 1839 bonds were sent to plaintiffs October 26; thinks he put them in the mail that day; sent them by plaintiffs' previous request. The arrangement was made in Boston with the plaintiffs; has not paid to the plaintiffs the amount loaned. The second bond on the Albert was a renewal of the first, (of May, 1838,) the plaintiffs lending me about $1,400 more, to make up the $3,600. The $2,200 named in bond of May, 1838, was used to buy the vessel. The property was insured, and the policy assigned to plaintiffs; does not recollect whether he received any money at the time of giving the bond on the Watson, or whether it was given on general account for previous arrangement for bottomry. The bond on the Watson was made under an arrangement that the plaintiffs should make further advances on the brig, and they were to advance me $10,000 more in the West Indies. In, or about October, 1839, I received enough from Greely and Guild to purchase outfits for the Albert, and a bond was executed to cover the advances. I cannot say whether the sums loaned me by Greely and Guild were charged to me in account or not; I do not recollect whether anything was said about my being personally liable for the money in case the vessel was lost. The plaintiffs had the whole control of the Albert while I was in the West Indies. I stated to Greely and Guild that if they would make me the advances in October, 1839, I would put the vessel into their hands as security. I have no recollection of anything being said between us about money advanced being exposed to risk.

The plaintiffs also read in evidence a written demand made by the plaintiffs upon the defendant, dated January 6, 1842, which, with the written reply of the defendant thereto, is hereto annexed, and makes part of this case. The defendant then proved that the vessel now in controversy was attached upon a writ in favor of the Exchange Bank against Luther Jewett, as the property of said Jewett, on the 29th day of October, 1839; that said vessels were afterwards replevied by the plaintiffs in suit commenced by them against Joshua M. Waterhouse, the attaching officer; that the judgment was rendered in said action of replevin in favor of said Waterhouse, at the November term (1841,) of the supreme judicial court of the state of Maine, holden within and for the county of Cumberland, and a writ of return issued December 24, 1841; that judgment was rendered at the same term of said supreme judicial court in favor of the plaintiffs, in the suit Exchange Bank against Luther Jewett, and execution issued against said Jewett on the same 24th December, 1841; that said writ of return against said Greely and Guild the plaintiffs in this suit, in said execution against said Jewett was duly delivered to the defendant, as sheriff of the county of Cumberland, to be executed; that by virtue of said writ of return the defendant demanded said brigs Albert and Watson of said Greely and Guild, who duly delivered the same to this defendant; that said brigs were thereafterwards duly sold by this defendant, as sheriff of the county of Cumberland, upon the execution in favor of the Exchange Bank against said Jewett.

A copy of the judgment of the supreme judicial court of Maine in the suit Greely and Guild against Waterhouse; also a copy of the writ of return issued upon said judgment, with the defendant's official return thereon; also a copy of the writ sued out by the Exchange Bank against Luther Jewett, with the sheriff's official return thereon; also a copy of the judgment of the supreme judicial court of Maine, in suit Exchange Bank against Luther Jewett, with a copy of the execution issued upon said judgment, and the sheriff's official return thereon, may be referred to by either party as a part of this case. The defendant also read in evidence a letter from Luther Jewett to Greely and Guild, dated October 28, 1839, and a letter from Greely and Guild to Luther Jewett, dated October 29, 1839, which letters may be referred to by either party. The defendant also read in evidence the deposition of Luther Jewett, taken in the suit Greely and Guild against Waterhouse, which deposition may be referred to by either party. It is admitted that Smith, the defendant, was sheriff of the county of Cumberland at the time of the alleged taking; and that Waterhouse was not an officer at that time, but ceased to be a deputy sheriff in February, 1841. The plaintiffs read in evidence two letters from Greely and Guild to Luther Jewett, dated October 22 and 24, 1839, which letters may be referred to by either party.

The court submitted to the jury the following questions, to which the jury returned the answers annexed:

1st. Were all of these bonds, or any of them, given for advances and acceptances of drafts, under a promise at the time, by Jewett, to execute the bonds in question as security for those advances and acceptances? If any and not all of them, were not executed under this arrangement, but for debts

existing before any such arrangement, please to state which. 2d. Were the advances and acceptances made, the obligees in fact relying on the bonds as charging the vessels? and not relying on Jewett's personal credit? If only a part of them were so made, please to state which.

Circuit Court, U. S. Oct. Term, 1846. Philip Greely et al. r. Joseph Smith. The jury find that the advance of thirty-six hundred dollars was made under a promise that a bond of the brig Albert should be made and executed by Luther Jewett to Greely and Guild as security for said advance of thirty-six hundred dollars. And that advances were not made and executed by said Greely and Guild to said Jewett under a promise that a bond of the brig Watson should be made and executed to said Greely and Guild as security for said advances, but the bond of the Watson was made and executed to secure the payment of a debt existing before that time. Answer to second question.—We also find that the plaintiffs did not intend to relinquish their personal claim on said Jewett, but received the bond as collateral security for the aforesaid advances and claims. Nathaniel Crockett, Foreman.

It is agreed that the value of the brig Albert at the time of the alleged taking, was one thousand and fifty dollars, and the value of two-thirds of the brig Watson, nine hundred and five dollars. The whole case is now submitted to the court upon the above evidence, under the finding of the jury upon the questions submitted to them, to enter such judgment as the law requires.

Deblois and Fessenden, for plaintiffs.
Mr. Rand, for defendant.

WOODBURY, Circuit Justice. The chief question in this case is, in whom was vested the property of the vessels sued for, at the time of the alleged conversion of them. If it was in the plaintiffs, they are entitled to recover. If not, no wrong has been done to them, as they had not the actual possession of the vessels; and either such a possession or property, and a right to possession founded on property, are necessary to enable a party to sustain trover. 4 Pick. 158; 5 Pick. 255; 7 Metc. [Mass.] 259. The plaintiffs set up property under three bonds, executed to them by Luther Jewett before the supposed conversion. These bonds are considered by them to be valid as bottomry bonds, so as to pass the title to these vessels. It is admitted on both sides, that this title was in Jewett before these bonds were executed—on the 11th of May, 1838, and 26th of October, 1839. The defendant justifies taking the vessels by another officer under a precept against Jewett, October 29th, 1839, in favor of the Exchange Bank, Jewett being then in the actual possession and use of them. For this last reason it is

necessary that those bonds should be valid as in bottomry, because if valid only as mortgages of the vessels, they were not recorded in conformity to the requisitions of a special statute in Maine concerning such mortgages, nor possession delivered to the mortgagee as required by the same statute, and therefore they did not pass the title as mortgages, so as to prevent the creditors of Jewett from attaching the vessels while in his possession.

Now, in respect to the validity of these bonds in bottomry, it is first objected, that their validity has heretofore been settled against the plaintiffs in a previous action of replevin between them and J. M. Waterhouse. On a writ or return, afterwards issued in favor of said Waterhouse, on that decision, the defendant as sheriff for the county of Cumberland, took and sold the vessels in controversy to satisfy the original debt in favor of the Exchange Bank against Jewett, and hence the present action has been instituted. But no plea in bar has been put in here, setting out this matter and averring that the parties in that action and this were the same in law, or the same in interest as privies. Nor is there any averment that the former judgment, being on a nonsuit of the plaintiff, was so after and on a hearing of the merits, so as to be a bar to another action for the same cause. See this case as first presented reported Greely v. Smith [Case No. 5,749]. Nor on this trial has any evidence to sustain those facts been gone into and discussed, though if offered and not rebutted it might avail the defendant probably notwithstanding the nominal parties are different. But on this for these reasons I give no opinion; nor whether the defendant, being a new sheriff, is privy to Waterhouse; nor whether in that action of replevin, the right to possession and not the title was alone settled as is now argued. 15 Me. 273. Perhaps, however, no injustice will be done as the case now stands, considering that new facts are said to be developed in the trial of this action, which did not appear in the other.

The facts in the other and the opinion of the state court thereon may be seen in Greeley v. Waterhouse, 19 Me. 9.

Let us then examine all which now appears in respect to the validity of these bonds. The principal new part here is, that the personal security relied on and the pre-existing debt, which create difficulties, existed only in the case of the third bond. In the examination of these debts, and of the old and new facts which are material, it may be useful to look first to the bond, executed May 11th, 1838. This was of the brig Albert for the sum of $2200, recited to be borrowed for the purpose of fitting her out for a voyage then contemplated. The interest was at the rate of .2½ per cent.; and the brig and her tackle, &c., were stated to be bound to pay the amount and to be

chargeable for the same at all times after her return. There is another clause in this bond, stipulating not clearly, as is argued, for the payment of a certain sum "within sixty days next after the safe arrival of the said brig Albert at her port of discharge in the United States," &c. But it seems to be to pay said sum "provided" certain acceptances are paid within sixty days, &c., and six per cent. interest thereon, equalling in all, $2,320.00.

I am strongly inclined to the opinion, that this bond does not mean to risk the debt at all on the loss of the vessel. If it does, the intention is doubtful and is expressed very indirectly and inartificially. It seems in one place to contemplate marine interest at 2½ per cent. though in another 6 per cent. It seems also to charge the vessel with the debt. But it nowhere indicates in express terms that the debt is to be lost if the vessel is lost; and the indirect reference of this kind, as to payment of a certain sum within sixty days after her safe arrival, seems as just mentioned, to be rather to the amount paid on the acceptances than the whole amount of the bond; and if meant to embrace all, is rather the fixing a time when the personal liability may be prosecuted than a condition, which must happen before that liability begins. Now, it is essential that the debt and interest appear clearly to be risked on the loss of the vessel, in order to make the bond one in bottomry. See cases cited in Leland v. Medora [Case No. 8,237]; [Conard v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 386; The Draco [Case No. 4,057], Mass., 1835; 2 Hagg. Adm. 48, 52, 65; 11 Pick. 187; Abb. Shipp. (5th Am. Ed.) 166, note; 3 Barn. & Adol. 50; 4 Bing. 244; Greeley v. Waterhouse, 19 Me. 9; The Mary [Case No. 9,187]; Rucher v. Conyngham [Id. 12,106]; 2 Dod. 8, 9. If risked on the bottom of the vessel, whether it be called "bottomry" or "bottomree," or neither, in the bond itself is wholly immaterial. 2 Hagg. Adm. 54, 55. The substance is regarded rather than the form. Simonds v. Hodgson, 3 Barn. & Adol. 50. When, however, it is not called bottomry in the bond, as it is not in this first one, this raises some presumption, if other matters are doubtful, that no bottomry was intended.

The next bond is dated October 26th, 1839, and is for $3,600. That sum is recited to have been advanced on the Albert, and is expressly stated to be "at bottomry;" and at marine interest, (though called 6 per cent. per annum,) and the debt is clearly risked on the loss of the vessel, Jewett paying over any salvage obtained on her. It further contained a power to sell the brig in case payment was not made within a year. The jury have also found that this whole amount was advanced under a promise by Jewett to execute a bottomry bond of the Albert therefor.

Under all these statements, therefore, in the bond itself, and under the finding by the jury, I see no sufficient reason for holding this bond to be invalid. The vessel itself is pledged. The advances were made on the promise of this pledge. Marine interest is reserved. The parties call the bond one in "bottomry," and the debt is expressly to be void if the vessel is lost. Though a prior bond had been executed for a part of the amount of this, a new one for the whole may be valid; and if valid in all respects would probably supersede or annul the first when the security is on the same matter. The Draco [Case No. 4,057]; [The Aurora], 1 Wheat. [14 U. S.] 96; [Conrad v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 435; 11 Pick. 183. If the personal liability was still to continue by the finding of the jury, it appears to me to relate rather to the next bond, than this—two-thirds of the Watson than this. The second bond is then valid. But how is the third on the Watson? It differs as to the kind of loan and the personal security. Such personal liability, when the vessel is not lost, (which is the fair construction of the case, under the express provisions in the bond, that the whole debt or bond should be void if the vessel was lost,) does not impair the bottomry. Jordan v. White, 4 Mart. (N. S.) 340. It is only a personal liability in case the vessel is not lost, which is harmless and common.

It is held in some cases that every maritime hypothecation includes a personal obligation. De Lovio v. Boit [Case No. 3,776]; 3 Burrows, 1394. And the borrower is of course personally liable if the ship arrives. Abb. Shipp. 163; 2 Bl. Comm. 457; 2 Hagg. Adm. 48; The Draco [supra]. That personal liability of the owner is proper in such case, for reasons set out in 11 Pick. 183; Marsh. Ins. 632; 2 Browne, Civ. & Adm. Law, 196, 197; Abb. Shipp. 126, note. In some countries the rule goes further. The Nelson, 1 Hagg. Adm. 176. But when a bond, in such language as here, is the sole evidence of a debt, no personal claim could be enforced after the loss of the vessel in such case. So, if the bond was considered collateral security, and was not the original debt or the sole evidence of it, then the original personal liability would remain, though the collateral security should in such case perish or become a nullity. In such a case the bond may be discharged, or not, and still leave the principal personal liability binding. It would be like the innocent loss of property mortgaged or of pledged property—the original debt would still remain. In this view, whether the bond now under consideration is void, or not, is the question, looking to the fact that it was given on account of the previous personal debt, and that this debt was to remain, though the bond and vessel became lost. Such is the case, piercing into the heart and essence of the transaction. The gist of the objection to the validity of such a bond in bottomry is, that the personal debt or liability is not put at risk on the loss of the vessel, but still survives though the vessel be lost. Here and in Europe it is settled that the per-

son is not and must not in bottomry, in case of a loss of the vessel, be bound for the debt, (though if any materials or salvage come into the owner's hands they must answer for that.) See cases before cited, and The Virgin, 8 Pet. [33 U. S.] 554; The Nelson, 1 Hagg. Adm. 169, 176; [The Tartar] Id. 1, 13; Rucher v. Conyngham [Case No. 12,106]; [Conard v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 446; 3 Barn. & Adol. 50; The Watchman [Case No. 17,251]; 3 Kent. Comm. 358; 1 Dod. 283, 411.

The only plausible answer urged to this, is, that it has been held in some cases that if the person is looked to, as well as the vessel, it may be deemed good as to the last and void as to the first, being void only pro tanto. The Nelson, 1 Hagg. Adm. 169, 176; Rucher v. Conyngham [supra]; The Virgin, 8 Pet. [33 U. S.] 554. For a bottomry bond may, on several accounts, be good in part and bad in part. 1 Hagg. Adm. 169, 176; Id. 1; The Packet [Case No. 10,654]; 2 Hagg. Adm. 68; [The Divina Pastora] 4 Wheat. [17 U. S.] 69; 2 Dod. 139, 147; Id. 288, 466. Thus it is if part of the consideration is good in bottomry and part not. The Packet [supra]; [The Virgin] 8 Pet. [33 U. S.] 538; [The Aurora] 1 Wheat. [14 U. S.] 107. It might be possible then to obviate the effect of the personal liability—in any event in this way —if it was contained in the bond itself; and not as here in the contract dehors the bond, and did not constitute the gist of the whole consideration, and had been released or abandoned by the obligee before the trial or the controversy. Thus, if the master put into a bond the personal liability of the owner, the latter may be waived by the obligee, and the bond continue good. Abb. Shipp. 160, note. But even then the obligee must himself abandon and separate what is bad. [The Aurora] 1 Wheat. [14 U. S.] 96; The Hunter [Case No. 6,904]. There, too, the original consideration is valid in bottomry, and only the personal security for it becomes void. But here, the whole original consideration for the bond itself, though good enough for a mortgage, was bad for a bottomry, being to remain as a personal pre-existing liability; not to be lost as such, though the vessel should be lost. Thus the original advance was made by the plaintiffs on personal security of the obligor. The bond, as a bottomry, was given sometime after, voluntarily, and only as a guarantee to the pre-existing debt, resting merely on personal security. See verdict, and 19 Me. 9. The personal obligation for the whole was not given up. The bond was collateral to that, rather than the personal security being collateral to the bond. It is usual to go into facts dehors the bond in these cases where creditors contest it, to see whether, in truth, the transaction was one of real bottomry, or not. 20 Pick. 242; 19 Me. 9. All the facts are to be examined and are competent for consideration.

On these explanations of the facts then the original debt appears to have been not risked on the ship but still retained on the person, and only the collateral security of the ship risked. 19 Me. 9; Jennings v. Insurance Co., Semb. 4 Bin. 244. A fortiori, therefore, the debt did not become one in bottomry, and discharged, if the ship was lost, because the facts were just the other way, showing the former still to be held and relied on. So particular are the books to separate personal liabilities from these bonds risked on the ship, that even a bottomry bond otherwise good will be void, if made by a master, where the personal liability of the owner had first been relied on. 1 Dod. 283; The Hunter [supra]; 2 Dod. 139. So, if any other security than the bond is taken, it must be collateral to the bond; and not the bond collateral to that, as to a bill of exchange. And it must be lost or discharged if the vessel is lost. This is the case with a bill of exchange taken beside a bottomry. The Hunter, 1 Dod. 486; The Hunter [supra]; The Zephyr [Case No. 18,210]; 1 Hagg. Adm. 179; Id. 1, 10.

It is proper to allude a moment to another objection to this last bond, pledging two-thirds of the Watson. The jury have found it was not executed to secure advances made for that voyage, or under a previous promise for such a bond, but to secure a pre-existing debt. It is not necessary to decide, whether this alone would avoid the bond, or not, but I cannot permit this point to pass without notice, lest an inference may be drawn as to my views on it, which is not true. If the money be obtained on the pledge of the ship, and for her repairs, though it be used for other purposes than fitting her out by the owner or master, the bond may still be good in bottomry. The lender can look only to the apparent necessity for it. 3 Barn. & Adol. 50; 19 Me. 14; 2 Browne, Civ. & Adm. Law, 186; The Fortitude [Case No. 4,953]. But, I understand, that on principle the loan should then be obtained professedly for the vessel. See Abb. Shipp. 162. In Blaine v. The Charles Carter, 4 Cranch [8 U. S. 328], it seemed to be admitted that a bottomry bond by the owner would not hold unless made for advances connected with the ship. Semb. Boreal v. Golden Rose [Case No. 1,658]; Putman v. The Polly [Id. 11,482]; Hurry v. The John & Alice [Id. 6,923]; Rucher v. Conyngham [supra]; 2 Browne, Civ. & Adm. Law, 196; Hurry v. Hurry [Case No. 6,922]; 1 Dod. 2, 3; 2 Bl. Comm. 457. See Leland v. The Medora [Case No. 8,237]. If the debt be pre-existing and not advances to aid the ship, and if the master hypothecate the vessel for it, by a bond, the latter is undoubtedly invalid. The Aurora, 1 Wheat. [14 U. S.] 96; The Mary [Case No. 9,187]; Abb. Shipp. 203, 204; The Draco [Case No. 4,057]; Hurry v. The John & Alice [supra]; The Virgin, 8 Pet. [33 U. S.] 550; Walden v. Chamberlain [Case No. 17,055]; 2 Dod. 8, 9;

Liebart v. The Emperor [Case No. 8,340]; Hurry v. Hurry [supra]; The Draco [supra]; The Randolph [Case No. 10,837]. I do not see why the same rule should not apply to the owner, though for another reason. If not, the case is not one of a charge on the ship's bottom for aid to the ship, which is the original idea of bottomry, whether by the master or owner. So, why can the master not pledge the ship, except for necessities to the ship? Because he has charge of the ship and the debt is merely to supply the necessities of the ship. Why can the owner do it and legally agree to give, and the lender receive over six per cent. interest? "Usura maritima." Marsh. Ins. 633. Because it may be necessary to obtain means to secure the ship and the voyage, and in this way better to furnish and virtually insure the cargo to the extent of the payment. 3 Kent, Comm. 354; 1 Dod. 278. The reasons are different but the result the same. In any other view, all the statutes of usury could be easily in this way avoided. The interest secured might be twenty per cent. on an old or new loan, disconnected with supplies to the ship, and the vessel be insured at any office for one or two per cent. only. I should come to the conclusion then at once, that a bond for a pre-existing debt like the third one, and perhaps a part of the consideration of the second one, so far as concerning the first bond, was void on that account, also, were it not for the decision in case of The Draco [supra], and adopted as it is in 3 Kent, Comm. 361. But they seem to me in some degrees erroneous by resting on an analogy to cases of respondentia bonds where the general rule is stated to be that they are binding, though for an old debt. [Conard v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 437; U. S. v. Delaware Ins. Co. [Case No. 14,942]; Atlantic Ins. Co. v. Conard [Id. 627]. They are often, also, given on a mere personal liability. 3 Kent, Comm. 354. I apprehend, likewise, that some error has been run into by confounding bottomries and mere mortgages, as the latter may of course be for old debts and those disconnected with supplies to the ship like mortgages of other property than ships. Hurry v. The John & Alice [supra]; Hurry v. Hurry [supra]. Hence the owner may mortgage the ship for old debts, but why should he be allowed to give bottomry bonds for them, and a door thus be opened wide to usury and oppression? why, unless to aid the ship in an emergency, and not for a former and disconnected transaction or debt? It is conceded, also, that the French law is against such a bond. The Draco [supra]. The bond being given after the ship sails is no exception when given to get money to pay for the advance. Marsh. Ins. 645. The general description of bottomries in most of the elementary treatises fortifies this view. It defines them as given for advances to aid in fitting out the ship on whose bottom they are founded. 2 Emérig. Ins. 385; 2 Bl. Comm. 457;

Poth. Cont. act 1, note; Park. Ins. 410; 2 Marsh. Ins. 733–736. The case of The Mary [Case No. 9,187] was a bottomry by an owner to obtain funds for the purchase of a cargo and held to be valid. It is doubtful if for an old independent debt, whether it would have been good except as a mere mortgage. The advances may be from time to time, and not at once, but still they must be in respect to the vessel. The Virgin, 8 Pet. [33 U. S.] 538. Many cases likewise speak of an hypothecation of a vessel being valid, when it is valid only as a mortgage and not as a bottomry. And the distinction in some cases and states is immaterial as to the parties, yet in this instance, in this state, where bottomries need not be recorded and mortgages must be, the distinction is vital as to these plaintiffs in a suit with attaching creditors.

It seems to me that the views in the case of The Draco [supra] do not accord with the current of decisions before cited on this point any more than with sound reasoning as regards the origin of bottomries and the danger of usury, and the admitted inability of the master to give such a bond in such a case. Again, the decision in 19 Me. 9, has been in this case already for the attaching creditor and against the bonds, so far as given for a pre-existing debt for which personal liability was still held, and it is entitled to respect, though not binding as not given on a local statute. See Thomas v. Hatch [Case No. 13,899]; Williams v. Suffolk Ins. Co. [Id. 17,738]; Hancox v. Fishing Ins. Co. [Id. 6,013]; Flagg v. Mann [Id. 4,847]; Smith v. Babcock [Id. 13,009]. So, although in Pope v. Nickerson [Id. 11,274], it was held that bottomry bonds are to be construed liberally for the obligee. So, 6 Bing. 114; 3 Barn. & Adol. 50; 1 W. Rob. Adm. 124; Abb. Shipp. 158. Yet I am inclined to think even an owner cannot make a good technical bottomry bond, unless for advances in some way connected with the vessel. The finding of the jury on this is strong proof that the last transaction was not at the time a commercial consequence of borrowing money to fit out that ship, the brig Watson, which is one of the elements in bottomry. 2 Hagg. Adm. 48. On the contrary, the last bond looks merely an ordinary taking of collateral security for a pre-existing debt, not incurred under a promise of bottomry nor agreed to be thus secured. It is not even recited in the bond, as is done in the first one, that it was executed for advances to this ship or any other. Such a course may answer in cases of respondentia like Conard v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 436, but it certainly does not accord with the technical principles, or the spirit of a bottomry undertaking. In a case like this, however, I should not, after the views of Judge Story, sanctioned by Chancellor Kent and sustained as some suppose by the Case of Conard, Id., dispose of a case is hostility to what seems thus settled. But I feel bound to express my dissent from

their conclusions, and some of the reasons for it, but enforce the doctrine they have maintained till overruled by the supreme court of the United States.

The other objection against the last bond, as to personal liability, is sufficient without this, and on that it must probably be deemer invalid as a bottomry. Nor is this objection cured or aided by the reservation of marine interest in the bond. Marine interest is some evidence that a bottomry was intended, but alone does not make it a bottomry bond. 2 Hagg. Adm. 65; Simonds v. Hodgson, 6 Bing. 114; The Mary [Case No. 9,187]. Some cases hold it to be an indispensable part (The Draco [Id. 4,057]; 1 W. Rob. Adm. 124; 2 W. Rob. Adm. 110), though marine interest may be fixed at 6 per cent. (The Draco [supra]), and, if not expressed, will be implied in the principal (The Mary [supra]; 19 Me. 14; [Conard v. Atlantic Ins. Co.] 1 Pet. [26 U. S.] 420). This makes the question of interest a nose of wax. The validity of the last bond is then too doubtful, on sound principles of bottomry, to justify a judgment on it in favor of the obligee, to the injury of bona fide creditors, who first attached and first took possession of the vessel, and that also without any notice proved to be brought home to those of the pre-existence of such a bond. I would uphold bottomry obligations in legitimate cases, coming clearly within commercial principles; but these unrecorded and unnotified liens on property left in the possession of former owners are not to be encouraged, nor extended beyond established precedents. See Packard v. The Louisa [Case No. 10,652]. Not feeling then entirely satisfied that judgment ought to be rendered on the last bond, as strictly a bottomry bond, it must be made up for only the amount of the second one, with interest; or the value of the Albert secured in that bond, and interest, if they be less in value than the second bond. But it must be only six per cent. This rate of six per cent. results from the present cause running so near the wind in another respect. The risk of the vessel here never took place. But the bond being good in form and substance, and the voyage and risk in course of the execution, I think if the voyage was defeated by third persons, as here, while the matter was executory, the bond is still good. Marsh. Ins. 647, 648. A ship has been held, even if the voyage is defeated by the owner. Wilmer v. The Smilax [Case No. 17,777]; 2 Browne, Civ. & Adm. Law, 530; The Draco, [supra]. But the interest allowed must be only 6 per cent., as the marine risk never actually began. Marsh. Ins. 647; Williams v. Steadman, Holt, 126; Skin. 345; 3 Kent, Comm. 357. The obligation remains good, like a mere mortgage, sometimes, though becoming bad, as a bottomry by the risk never being incurred. Thorndike v. Stone, 11 Pick. 188. But here the bottomry on the Albert was good till obstructed and the voyage defeated by the attachment and sales by the defendant and those he acts under, and consequently it must prevail.

[NOTE. In Case No. 5,747 the plaintiffs moved to amend their writ by striking out the names of certain officers of the Exchange Bank, in order to give the court jurisdiction. The motion was granted. In Case No. 5,748 the surrender of the charter of that bank was suggested, and it was decided that the suit against it thereby abated, leaving Smith the sole defendant, who thereupon (Id. 5,749) filed a plea of a former judgment in bar, to which plea there was a demurrer and joinder. The demurrer was allowed, and the case ordered to trial.]